**William L. MARSHALL, Plaintiff,**

v.

**Charles KOZAKIEWICZ, Warden, Edward Urban, Lieutenant, George Moneck, Counselor, Chris Sercone, Counselor, Defendants.**

**Civ. A. No. 81–2282.**

United States District Court,
W.D. Pennsylvania,
Civil Division.

Feb. 12, 1985.

Anthony Picadio, Pittsburgh, Pa., for plaintiff.

David M. Neuhart, Pittsburgh, Pa., for defendants.

## OPINION

SIMMONS, District Judge.

### I.

This is an appeal to the district court from a case which was tried non-jury before a United States Magistrate on the consent of the parties with the further consent to take any appeal to the district court, in accordance with 28 U.S.C. § 636(c)(4). The case was tried before the Magistrate on September 5, 1984, and a Summary of Testimony and an Opinion and Order were filed on September 19, 1984, granting judgment in favor of the Defendants and against the Plaintiff. The parties have filed briefs in support of their respective positions, have agreed that no oral argument is needed in connection with the decision of this appeal, and have also stipulated that the Summary of Testimony as filed by the Magistrate is accurate and is a sufficient basis for the purposes of deciding this appeal.

### II.

At the time of the non-jury trial before the Magistrate, Plaintiff Marshall was a prisoner who was then serving a sentence at the State Correctional Institution in Pittsburgh, Pennsylvania. Marshall was sentenced August 12, 1980 to 9–18 years upon convictions for attempted burglary, aggravated assault, terroristic threats and receiving stolen property, and on May 16, 1980, was sentenced to 7–20 years to run concurrently with the previous sentence. Prior to the date of the incident which is the subject of this action, Plaintiff had been incarcerated in the Allegheny County Jail, the State Correctional Institution at Pittsburgh, and the State Correctional Institution at Huntingdon without having any disciplinary charges brought against him.

He was in the general population at the Allegheny County Jail and in general population at Huntingdon from October 1980 to April 27, 1981.

On April 27, 1981, Plaintiff Marshall was transferred from Huntingdon to Allegheny County Jail in Pittsburgh for a post conviction hearing act proceeding. In conjunction with this transfer, Huntingdon officials forwarded to Allegheny County Jail officials a document revealing that Plaintiff was serving a 9–20 year sentence, that his minimum date was March 20, 1989, and his maximum date was September 23, 2000. His custodial classification was III–A, general population, at Huntingdon, and included in the document was a recommendation "Close supervision due to length of sentence."

When Plaintiff Marshall arrived at the Allegheny County Jail, he was placed in selective housing and was told that he could not be transferred to general population until the next day. He was permitted to keep his own clothing, was allowed to use the telephone and library and move throughout the area. The following day Defendant Lieutenant Urban, shift commander and Hearing Committee chairman, and Defendants George Moneck and Chris Sercone, counselors, met with Plaintiff Marshall. Defendant Urban told Plaintiff he was to be placed in "administrative custody maximum" because he was a security risk. Plaintiff objected, explaining that he had never been in trouble and was in general population at Huntingdon, and requesting that he be permitted to call witnesses to testify as to his status at Huntingdon. However, Plaintiff was told that he could not call witnesses or have a due process hearing, and was informed he was to be placed in administrative custody maximum because of the recommendation given in the temporary transfer information. Defendant Urban then prepared documents and presented them to Plaintiff indicating that Plaintiff was not charged with a misconduct but "other". Plaintiff was then taken to the Restricted Housing Unit for high security risk prisoners, his clothes and personal items were taken, he was restrict-

ed to his cell, allowed out only for visits and library use, and was shackled when he was removed from his cell. During his three days in the Allegheny County Jail he received no exercise and slept on a cot with two sheets as bedding.

Plaintiff met with Defendant Sercone, his counselor, on April 29, 1981, who prepared a "request to staff member" for him. Plaintiff complained that he was unable to go to the law library, and wanted to see the Huntingdon document which stated he was a threat to security. The next day he received an answer, advising him that he could go to the law library, although he would be escorted and shackled with the cuffs being removed only while he was locked in the law library. He was not permitted access to the Huntingdon document, and he remained on the "D" Range until he was returned to Huntingdon on May 1, 1981.

Plaintiff called as witnesses other prisoners at State Correctional Institutions in Pennsylvania who were transferred to the Allegheny County Jail and placed in general population.

### III.

The Magistrate, guided by the case of *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), determined that Plaintiff Marshall did not have a liberty interest which entitled him to due process protection. Turning to the applicable statute, 37 Pa.Code § 95.225 (pertaining to county jails), the Magistrate determined that since the applicable statute did not require specific findings in order to apply a particular classification but instead identified eleven factors, all of which are to be considered, but no one of which is determinative, that statute therefore did not contain the specific substantive predicates and explicitly mandatory language the *Hewitt* Court found necessary in order for a liberty interest to be created. Because section 95.225 affords county jail officials broad discretion in classification of prisoners, the Magistrate held that no Fourteenth Amendment liberty interest was created by that section.

The Magistrate then determined that the Memorandum dated April 16, 1981, "Operational Program—High Risk Security Prisoners—Allegheny County Jail" also did not create a liberty interest since that document was primarily a description of the restrictions imposed and did not address the procedures to be utilized in determining whether an inmate should be placed on the "D" Range. The Magistrate conceded that Plaintiff Marshall was not given an opportunity to present his reasons as to why he should not be placed in administrative custody maximum, but found that Plaintiff Marshall was not deprived of due process since he did not have a state-created liberty interest.

In *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), a prisoner incarcerated in the State Correctional Institution at Huntingdon, Pennsylvania claimed that his rights under the Due Process Clause of the Fourteenth Amendment were violated when he was confined to administrative segregation following a prison riot.

The *Hewitt* Court reiterated that prison officials have broad administrative and discretionary authority over the institutions they manage, and that lawfully incarcerated persons retain only a narrow range of protected liberty interests. 459 U.S. at 467, 103 S.Ct. at 869, 74 L.Ed.2d at 685. "As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montanye v. Haymes*, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). The transfer of an inmate to more restrictive quarters for non punitive reasons was held by the *Hewitt* Court to be well within the terms of confinement ordinarily contemplated by a prison sentence and the type of confinement that inmates should reasonably anticipate receiving at some point in their incarceration.

However, the *Hewitt* Court found that a state may create a liberty interest protected by the due process clause through the enactment of certain statutory or regulatory measures, when those measures go beyond simple procedural guidelines. The *Hewitt* Court was persuaded that the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest.

The language that the *Hewitt* Court considered to be of an unmistakably mandatory character was as follows:

An inmate who has allegedly committed a Class I Misconduct may be placed in Close or Maximum Administrative Custody upon approval of the officer in charge of the institution, not routinely but based upon his assessment of the situation and the need for control pending application of procedures under § 95.103 of this title.

37 Pa.Code § 95.104(b)(1) (1978).

An inmate may be temporarily confined to Close or Maximum Administrative Custody in an investigative status upon approval of the officer in charge of the institution where it has been determined that there is a threat of a serious disturbance, or a serious threat to the individual or others. The inmate shall be notified in writing as soon as possible that he is under investigation and that he will receive a hearing if any disciplinary action is being considered after the investigation is completed. An investigation shall begin immediately to determine whether or not a behavior violation has occurred. If no behavior violation has occurred, the inmate must be released as soon as the reason for the security concern has abated but in all cases within ten days."

37 Pa.Code § 95.104(b)(3).

Additionally, a state Bureau of Correction Administrative Directive stated as follows:

Pending arrival of the State Police, the institutional representative shall:

1. Place all suspects and resident witnesses or complainants in such custody, protective or otherwise, as may be necessary to maintain security. A hearing complying with [37 Pa.Code § 95.103] will be carried out after the investigation period. Such hearing shall be held within four (4) days unless the investigation warrants delay and in that case as soon as possible.

Pa.Admin.Div. BC–ADM 004, § IV(B) (1975).

The regulations applicable in the instant case are different, however, from those pertaining to state institutions which were involved in *Hewitt*, and the provisions which are applicable here to county jails read as follows:

§ 95.225 Classification.

(a) *Generally.* Every jail in the Commonwealth should use a classification process to coordinate all information about the prisoner so that decision concerning security, housing, and treatment programs may be made on a basis of knowledge instead of guess. Classification may be an uncomplicated or a very complex process depending upon the size, physical facilities, and staff of the jail. The purpose of classification is to help the jail administrator as follows:

(1) Assure the security of the jail.

(2) Assure the welfare of the inmates.

(3) Assure the protection of the community by preventing escapes.

(4) Assure the most effective use of the jail, within its limitations, as an instrument of correction and rehabilitation.

(b) *Minimum requirements.* The minimum requirements as regards classification of prisoners in county jails are as follows:

(1) To implement a classification process, the jail administrator in counties of the first through fifth class shall form a classification committee composed of representatives of administration, security, and treatment. A citizen member of the community may also be of great benefit to the committee.

(2) In determining each prisoner's degree of security needed, housing assignment, job assignment, and overall

treatment plan, the following items should be considered through the classification process:

(i) Sex

(ii) Age

(iii) Crime

(iv) Sentence

(v) Past criminal history

(vi) Medical condition and needs

(vii) Mental condition and needs

(viii) Educational and vocational needs

(ix) Special services and program needs

(x) Other pertinent information

(xi) The thinking and feeling of the prisoner about his or her life and future plans.

(3) If possible, each prisoner should appear before the classification committee to discuss his or her case and future life goals.

(4) Each prisoner should be informed of the decision and the reason for the decision of the classification committee.

(5) Classification is an on-going process and a procedure for reclassification shall be developed and each prisoner shall be informed under what conditions reclassification is possible.

37 Pa.Code § 95.225.

■ This Court agrees with the Magistrate that the language cited in section 95.225 above is distinguishable from the language contained in the statute in *Hewitt*, which the Supreme Court found to be mandatory in nature. The applicable language here identifies the eleven factors which should be considered in the classification process; they are not determinative but rather are discretionary in nature. Further, there is no requirement in section 95.225 that the committee hold a hearing with the prisoner present. Because section 95.225 accords county jail officials broad discretion in the classification of prisoners, it does not create a protectable Fourteenth Amendment liberty interest.

The Plaintiff further argues that the Operational Program at Allegheny County Jail for High Risk Security Prisoners indicates a limit on the discretion of Allegheny County Jail officials and permits segregation into administrative custody, maximum, of only those prisoners who are a threat to others or themselves.

Section I of the Operational Program for High Risk Security Prisoners provides as follows:

I. Range (D)—in the selective housing unit is designated to house those inmates who have demonstrated by their actions, to be assaultive, behavior problems, escape risks, threats to staff and other inmates of the jail, or disruptive to the good order of the institution. Also those inmates who are received from other institutions with documentation of special behavior problems, that if placed in the general population of the jail, would be a disruptive influence in the orderly operation of the jail.

■ This administrative order describes the categories of inmates who are to be placed on D Range and the remainder of the document prescribes limitations on the rights and privileges of D Range inmates. However, this Administrative Order does not set forth procedures that must be used in determining whether a particular inmate should be housed on the D Range. There is nothing in the document to indicate that it is an independent limitation on the discretion of jail officials to classify prisoners or that it is the warden's more restrictive interpretation of the broad and discretionary state regulations set forth in section 95.225. The Court agrees with the Magistrate that Section I of the Administrative Order is merely descriptive rather than a substantive predicate, and therefore it does not create a liberty interest which is entitled to protection under the Due Process Clause of the Fourteenth Amendment. The decision of the Magistrate will therefore be affirmed.