Raymond J. STEPHANY, Appellant,

v.

George WAGNER, Warden, Robert Santoro, Assistant Warden, Joseph DeMarco, Prison Administrator.

No. 87–1122.

United States Court of Appeals, Third Circuit.

Argued Aug. 18, 1987.

Decided Dec. 15, 1987.

Rehearing and Rehearing In Banc Denied Jan. 5, 1988.

---

**5.** In light of our decision, we need not decide whether the method of stowage was a proximate cause of the injury.

Allen C. Welch (argued), Harrisburg, Pa., for appellant.

Kenneth E. Sands, Jr., Robert R. Reber (argued), Reading, Pa., for appellees.

Before GIBBONS, WEIS and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

Raymond J. Stephany filed this civil rights action under 42 U.S.C. § 1983 against various officials of the Berks County Prison (Prison), alleging that his due process rights were violated by his two month confinement in administrative segregation in the Prison. On cross-motions for summary judgment the district court entered judgment for defendants, finding that the Prison rules regarding administrative segregation do not give rise to a constitutionally protected liberty interest in remaining in the general prison population.

Stephany argues on appeal that because a Prison rule establishes specific substantive predicates for confinement in administrative segregation, it creates a liberty interest. If it does, we would be required to remand so that the district court could resolve the factual conflict as to whether Stephany received the process that was due.

## I.

### Facts

On July 31, 1983, while incarcerated in the Berks County Prison, Stephany was transferred from the general prison population to administrative segregation. Confinement in administrative segregation is more restrictive than that in the general prison population: Stephany's privileges were limited, he was confined to his cell except for exercise and showers, his visitation rights were restricted, he was prohibited from having contact with the general prison population, and he was denied access to activities that would have been available to him had he remained in the general prison population.

The next day, Stephany was given a form entitled "Record of Administrative Segregation" which stated merely, "[b]ased on information received this individual is being locked up as a security risk." App. at 16. On at least three occasions, Stephany wrote to prison officials requesting more specific information regarding the reasons for his confinement and a hearing on the matter. Stephany was never given a hearing and the only explanation he received in response to his request for information was a note from Warden Wagner stating that, "[y]our status is that of a security risk. You seem well aware of the fact. The fact that you deny this does not necessarily mean you are innocent." App. at 17.[1] The prison officials have since explained that Stephany was placed in administrative segregation "based upon reports received from several officers and a prison informant regarding an escape attempt from the Berks County Prison in which it was believed [Stephany] was involved." App. at 30.

Stephany's transfer to administrative segregation was reviewed and approved by both Warden George Wagner and Assistant Warden Robert Santoro within two

---

1. Robert Santoro, Assistant Warden of the Prison, responded to a similar request from Stephany by stating that "Warden Wagner has already responded." App. at 34.

days of his placement therein. In addition, various prison officials reviewed Stephany's continued segregation on nearly a daily basis throughout its duration. On October 7, 1983, after more than two months in administrative segregation, Stephany was returned, without explanation, to the general prison population. Stephany was never charged with misconduct or crime in connection with the events that resulted in his placement in administrative segregation.

Stephany filed a *pro se* complaint in the United States District Court for the Eastern District of Pennsylvania alleging that Warden Wagner, Assistant Warden Santoro and Prison Administrator Joseph De-Marco violated his civil rights under 42 U.S.C. § 1983 by placing him in administrative segregation without providing him with notice of the particular reasons why he was so segregated and with a meaningful opportunity to present his own views. Stephany contended that he had a constitutionally protected liberty interest to remain in the general prison population by virtue of a rule[2] contained in the Berks County Prison Residents Handbook (the Handbook). The defendants argued that the Handbook rule is merely descriptive and does not create a liberty interest. The district court agreed with defendants and granted their motion for summary judgment. *Stephany v. Wagner,* 655 F.Supp. 155, 158 (E.D.Pa.1987). Our scope of review over the grant of summary judgment is plenary. *See Struble v. New Jersey Brewery Emp. Welfare Trust Fund,* 732 F.2d 325, 330 (3d Cir.1984).

## II.

### Discussion

It is well established that the requirements of procedural due process are triggered only when a protected interest is at stake. *See e.g., Meachum v. Fano,* 427 U.S. 215, 223–24, 96 S.Ct. 2532, 2537–38, 49 L.Ed.2d 451 (1976). A protected liberty interest may arise directly from the Consti-

tution or from a state statute, *see, e.g., Board of Pardons v. Allen,* —— U.S. ——, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987) (state statute creates liberty interest in parole release), regulation, *see, e.g., Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) (state regulations create liberty interest in remaining in general prison population), or prison rule "defining the obligations of the authority," *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 465, 101 S.Ct. 2460, 2465, 69 L.Ed. 2d 158 (1981); *see Clark v. Brewer,* 776 F.2d 226, 232 (8th Cir.1985) (written policy regarding transfers to administrative segregation that were contained in a department of corrections employees' manual); *Gurule v. Wilson,* 635 F.2d 782, 785 (10th Cir.1981) (guideline in prison officials' manual covering reclassification system).

The Supreme Court has recently decided that the Due Process Clause does not give a prisoner a liberty interest in remaining in the general prison population because "administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Hewitt,* 459 U.S. at 468, 103 S.Ct. at 869. Therefore, we must determine whether Stephany has a state-created liberty interest in remaining free from administrative segregation.

The Pennsylvania regulations at issue in *Hewitt* are not applicable to county prisons. There are also state regulations governing the classification of prisoners in county correctional institutions, but Stephany does not rely on these for his claim of a liberty interest, possibly because the district courts have consistently held that these regulations do not create a liberty interest. *See, e.g., Tyler v. Rapone,* 603 F.Supp. 268 (E.D.Pa.1985); *Marshall v. Kozakiewicz,* 601 F.Supp. 1549 (W.D.Pa.1985). Stephany bases his claim of such a liberty interest on the rule governing administrative segrega-

---

**2.** The relevant provision of the Berks County Prison Residents Handbook regarding the standards and procedures to be utilized in cases of

administrative segregation has been referred to by the parties as both a "regulation" or a "rule." We will use the term "rule" throughout.

tion contained in the Berks County Prison Residents Handbook.[3]

The Handbook rule on which Stephany relies provides, *inter alia:*

D.   Administrative Segregation:

Definition: The confinement of an inmate to his own or another cell pursuant to administrative review consistent with the policy outlined below.

1.   Indications for Use:

Administrative segregation may be considered when:

(a) The security of the institution and/or the safety of any individual(s) is immediately threatened.

(b) Upon the recommendation of a physician or mental health caseworker that, in his or her professional opinion, it would be in the best interests of said inmate(s) to be confined.

(c) When an inmate engages in behaviors that are immediately threatening to his/her life and/or health.

(d) When an inmate requests protective custody.

■   Stephany argues that the district court erred in focusing on the absence of any provisions for written notification to the prisoner or for a hearing. *See Stephany,* 655 F.Supp. at 157. It is of course correct that mandatory procedures are not a prerequisite to finding a state-created liberty interest. For example, in *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 539–41, 105 S.Ct. 1487, 1491–93, 84 L.Ed.2d 494 (1985), the Court, in holding that states may not condition the grant of a property interest in public employment through limitation of the procedures to be applied, explained that once the state created a substantive property right, the floor for the procedures due is set by the federal Constitution. *See also Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 432, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982). Conversely, the specification of particular procedures does not in itself create a protected liberty interest. *See Olim*

*v. Wakinekona,* 461 U.S. 238, 249–51, 103 S.Ct. 1741, 1747–49, 75 L.Ed.2d 813 (1983).

It follows that the existence of specified procedures alone is neither necessary nor sufficient to create a liberty interest, but, rather, is relevant only to the extent that it evidences a state's intent to limit official discretion. As the Supreme Court has noted, "the State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the State does not create an independent substantive right." *Olim,* 461 U.S. at 250, 103 S.Ct. at 1748 (footnote omitted); *see Hewitt,* 459 U.S. at 471, 103 S.Ct. at 871 (fact that Pennsylvania created a careful procedural structure to regulate use of administrative segregation does not indicate existence of protected liberty interest); *see also Toussaint v. McCarthy,* 801 F.2d 1080, 1097 (9th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987); *Beard v. Livesay,* 798 F.2d 874, 877 (6th Cir.1986).

■   Thus, the dispositive question in determining whether a state rule creates a protected liberty interest is whether it "plac[es] substantive limitations on official discretion." *Olim,* 461 U.S. at 249, 103 S.Ct. at 1747. Specifically,

[a]n inmate must show "that particularized standards or criteria guide the State's decisionmakers." *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 467, 101 S.Ct. 2460, 2466, 69 L.Ed.2d 158 (1981) (Brennan, J., concurring). If the decisionmaker is not "required to base its decisions on objective and defined criteria," but instead "can deny the requested relief for any constitutionally permissible reason or for no reason at all," *ibid,* the State has not created a constitutionally protected liberty interest. See *id.,* at 466–467, 101 S.Ct. at 2465 (opinion of the court); see also *Vitek v. Jones,* 445 U.S. 480, at 488–491,

---

**3.** The record does not establish by whom the Berks County Prison Residents Handbook was promulgated and the purposes for which it was issued. Defendants do not argue that the Handbook rule does not carry the necessary force to

establish a liberty interest. In view of this concession by the defendants, we do not address the issue of whether a Handbook provision is, in fact, a rule or regulation binding on prison authorities in other circumstances.

100 S.Ct. 1254, 1261–63, 63 L.Ed.2d 552 (1980) (summarizing cases).

*Id.*

Arguably, the fact that the Prison rule specifies four occasions in which administrative segregation is appropriate can be read to suggest that these are the only such occasions. If so, the rule would sufficiently limit the prison officials' discretion to create a liberty interest. It appears to us, however, that that argument, although plausible, is precluded by the Supreme Court's analysis in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the case presenting the most analogous issue.

The Pennsylvania prison regulations considered in *Hewitt* also contained specific substantive predicates for administrative segregation, *i.e.* "where it has been determined that there is a threat of a serious disturbance, or a serious threat to the individual or others." *Id.* at 470–71 n. 6, 103 S.Ct. at 871 n. 6. The Supreme Court, however, did not rely only on the presence of such substantive predicates in concluding that the state had created a protected liberty interest. In fact, it characterized as having "considerable force" the argument "that the decision whether to confine an inmate to administrative segregation is largely predictive, and therefore that it is not likely that the State meant to create binding requirements." *Id.* at 472, 103 S.Ct. at 871.

Instead of focusing solely on the substantive predicates, the Court looked to both the state's use of "language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed," *and* the provision "that administrative segregation will not occur absent specified substantive predi-

cates," as the basis for its conclusion that the regulations sufficiently constrained official discretion to create a liberty interest. *Id.* at 471–72, 103 S.Ct. at 871; *see Hayes v. Lockhart,* 754 F.2d 281, 283 (8th Cir.1985) (regulation requiring, *inter alia,* a hearing prior to placement in administrative segregation creates liberty interest); *Parenti v. Ponte,* 727 F.2d 21, 25 (1st Cir.1984) (in conjunction with substantive predicates, "detailed procedural requirements" create liberty interest). It follows that we must examine whether the Prison rule at issue in this case contains explicitly mandatory language comparable to the regulations at issue in *Hewitt.*

The *Hewitt* regulations mandated that the inmate "shall be notified in writing as soon as possible that he is under investigation and that he will receive a hearing if any disciplinary action is being considered after the investigation is completed." 459 U.S. at 471 n. 6, 103 S.Ct. at 871 n. 6. There is *no comparable provision* in the Prison rule.[4] Instead, the Prison rule requires only that in situations warranting administrative segregation, the Shift Commander shall report to the warden or assistant warden or, if neither is available, shall "use his discretion." App. at 45. The *Hewitt* regulations next provided that "[a]n investigation shall begin immediately to determine whether or not a behavior violation has occurred." 459 U.S. at 471 n. 6, 103 S.Ct. at 871 n. 6. The Prison rule does not command an investigation in the same terms, but instead merely assumes that there will be a "comprehensive investigation and review." App. at 45.

Finally, the *Hewitt* regulations provided that "[i]f no behavior violation has occurred, the inmate must be released as

---

**4.** The procedure specified in the applicable Berks County Prison rule is as follows:

  2. Provisions:

    (a) When any of the above situations occurs, the Shift Commander on duty shall report immediately to either the Warden or Assistant Warden. In the event that these individuals cannot be reached the Shift Commander shall use his discretion in the matter and shall consult the Warden or Assistant Warden as soon as is practical.

    (b) After comprehensive investigation and review of the matter, the Administrator may:

      (i) Order an individual confined to his own cell.

      (ii) Transfer an individual to another area or cell.

    (c) The matter in question will be reviewed by the Administration on a daily basis, and restrictions will be modified as the situation warrants.

App. at 45.

soon as the reason for the security concern has abated but in all cases within ten days." 459 U.S. at 471 n. 6, 103 S.Ct. at 871 n. 6. No comparable time limitation exists in the Prison rule, nor is there any language governing a segregated inmate's return to the general population. The rule states merely that "restrictions will be modified as the situation warrants." App. at 45. The decision as to when an inmate is to be released from administrative segregation is thus left wholly unchecked. This is in contrast to the procedures mandated by other prison rules which have been found to supplement the specified substantive predicates in creating a liberty interest. For example, in *Toussaint v. McCarthy*, 801 F.2d 1080, 1098 (9th Cir.1986), the prison regulations provided that "[r]elease from segregation status *shall* occur at the earliest possible time in keeping with the circumstances and reasons for the inmate's initial placement in administrative segregation."

In sum, although the Prison rule does require daily review "of the matter in question", the Prison rule is otherwise in sharp contrast to the Pennsylvania regulations because of the absence of any comparable mandatory criteria. *See Hall v. Unknown Named Agents*, 825 F.2d 642 (2d Cir.1987) (no liberty interest implicated in transfer to special adjustment unit when no pre-transfer procedures were necessary and no substantive predicates existed).

We are, of course, cognizant of the irony in relying for our conclusion that the Prison rule does not create a liberty interest on the Supreme Court's opinion in *Hewitt* which ultimately held that the Pennsylvania regulations did create a liberty interest. The only explanation for the Court's holding appears in the one paragraph pointing to the language in the Pennsylvania regulations of "an unmistakably mandatory character." *Hewitt*, 459 U.S. at 471–72, 103 S.Ct. at 871. We find some guidance else-

where in the opinion where the Court followed the theme of its recent decisions in stressing that "the safe and efficient operation of a prison on a day-to-day basis has traditionally been entrusted to the expertise of prison officials." *Id.* at 470, 103 S.Ct. at 870. The Court suggested that, therefore, "regulations structuring the authority of prison administrators may warrant treatment, for purposes of creation of entitlements to 'liberty,' different from statutes and regulations in other areas." *Id.*

Our conclusion that the Prison rule does not create a liberty interest leads to the disquieting result that prison officials could commit a prisoner such as Stephany to administrative segregation for months without giving him a meaningful opportunity to correct what may be the erroneous factual basis upon which such commitment was based. We are bound, however, to leave correction of the situation to the state or prison authorities.

### III.

We conclude that we are constrained by the decision in *Hewitt v. Helms* to agree with the district court that the Prison rule in question does not create a liberty interest in prisoners to be free from administrative segregation.[5] We will therefore affirm the order of the district court granting summary judgment for the defendants.

GIBBONS, Chief Judge, dissenting:

Raymond J. Stephany appeals from a summary judgment on his complaint seeking redress for having been confined, without notice of charges and without a pre or post confinement hearing, to administrative segregation while he was a prisoner at the Berks County Prison. The majority, conceding that for purposes of our review we must assume the truth of Stephany's charge that he was subjected to administra-

---

**5.** The district court also appears to have held, in the alternative, that even if the Prison rules had created a liberty interest requiring compliance with due process prior to administrative segregation, there was no denial of due process because "the procedures outlined in the Handbook were followed with respect to Stephany." *Stephany v. Wagner*, 655 F.Supp. 155, 158 (E.D.Pa. 1987). In light of our holding today, we do not reach the issue of whether or not the process afforded Stephany comported with the Due Process Clause of the Fourteenth Amendment.

tive segregation without notice or a hearing, without using Justice Rehnquist's "bitter with the sweet" expression, adopts precisely the method of analysis with respect to positive law expectations that he has unsuccessfully urged on his colleagues for over thirteen years.

The Supreme Court has, since the early 1970's, consistently held that when positive law, state or federal, creates a property or liberty expectation, the procedural due process protection to be afforded that expectation is determined by federal due process standards. *See, e.g., Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (hearing required before termination of welfare benefits); *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (hearing required before driver license suspension). Cases such as *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) where the absence of an expectation grounded in state positive law is clear were relatively uncontroversial. In cases when state or federal law did suggest legitimate expectations, however, the imposition of federal procedural due process protections for legitimate expectations troubled some justices, notably Justice Rehnquist. In *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 1634, 40 L.Ed.2d 15 (1974), he unsuccessfully urged that "where the grant of a substantive right is inextricably intertwined with the limitations on the procedures employed in determining that right, a litigant [must] take the bitter with the sweet." *Id.* at 153, 94 S.Ct. at 1644. That method of analysis would have collapsed the distinction between nonconstitutional positive law, liberty or property expectations, and procedural due process requirements, which the court so carefully made in *Board of Regents v. Roth,* 408 U.S. at 569, 92 S.Ct. at 2705; *Perry v. Sinderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1973) and many similar cases.

Justice Rehnquist's approach, however, never carried the day. It was rejected by a majority of the justices in *Arnett v. Kennedy* as inconsistent with *Board of Regents v. Roth* and *Perry v. Sinderman. See* 416 U.S. at 164, 94 S.Ct. at 1649 (Powell J.,

joined by Blackmun, J.); *Id.* at 171, 94 S.Ct. at 1652 (White, J.); *Id.* at 203, 94 S.Ct. at 1668 (Douglas, J.); *Id.* at 206, 94 S.Ct. at 1670 (Marshall, J. joined by Douglas and Brennan, JJ.). Thereafter, in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) the court articulated the federal balancing standard for determining what process is due, but still carefully separated that process determination from the quite different issue of whether the relevant positive law created legitimate expectations of treatment or benefit. An exemplary mode of analysis in which the positive law expectation and its attendant procedural content were determined independent of each other was made with respect to transfers from a prison to a hospital in *Vitek v. Jones,* 445 U.S. 480, 491, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552 (1980), a case in which the opinion of the Court noted that "minimum [procedural] requirements [are] a matter of federal law, they are not diminished by the fact that the State may have specified its own procedure that it may deem adequate for determining the preconditions to adverse official action." Despite *Mathews v. Eldridge* and *Vitek v. Jones,* however, Justice Rehnquist's *Arnett v. Kennedy* "bitter with the sweet" heresy continued to appear in arguments before the Supreme Court, and to be accepted by lower courts. In *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) the heresy was definitively rejected by eight justices. Referring to *Vitek v. Jones, supra* and *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 432, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982) Justice White wrote:

In light of these holdings, it is settled that the "bitter with the sweet" approach misconceives the constitutional guarantee. If a clearer holding is needed, we provide it today. The point is straightforward: the Due Process Clause provides that certain substantive rights— life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct. Were the rule otherwise, the Clause

would be reduced to a mere tautology. Property cannot be defined by the procedures provided for its deprivation any more than can life or liberty. The right to due process "is conferred, not by legislative grace, but by constitutional guarantee. While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards." *Arnett v. Kennedy, supra* [416 U.S.] at 167 [94 S.Ct. at 1650] (Powell, J., concurring in part and concurring in result in part); *see id.*, at 185 [94 S.Ct. at 1659] (White, J., concurring in part and dissenting in part).

In short, once it is determined that the Due Process Clause applies, "the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 [92 S.Ct. 2593, 2600, 33 L.Ed.2d 484] (1972). The answer to that question is not to be found in the Ohio statute.

470 U.S. at 541, 105 S.Ct. at 1493. Only *Justice Rehnquist* dissented.

It is readily apparent that the majority, although it does not use Justice Rehnquist's "bitter with the sweet expression," adopts precisely the method of analysis with respect to positive law expectations that he has unsuccessfully urged on his colleagues for over thirteen years. Carefully piecing together, out of context, bits and pieces of the opinion of the court in *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1982) the majority treats that case as if the minority position in *Arnett v. Kennedy* defining positive law entitlements in terms of the procedural requirements in that law, had actually prevailed.

The proper method of analysis is to look separately at the positive law entitlement, and then to compare the procedures provided by the lawmaking authority which created it with those required by federal procedural due process. When, as here, the lawmaking authority is a state agency, the initial task of determining if there is an expectation involves a determination of state law. In deciding whether state law creates a legitimate expectation of treatment or benefit, such as a liberty or property interest, a federal court must take a close look at the state agency's definition of that interest. The purpose of that close look, however, is not to substitute federal substantive content, but only to prevent the avoidance or evasion of federal due process procedural rules by an unduly narrow interpretation of the interest. Separation of consideration of the substantive legal interest from the procedural protections to be afforded the holder of that interest thus recognizes the appropriate limits of state and federal law making competence. Indeed, *Hewitt v. Helms* recognizes as much by expressly rejecting the respondent's contention that state procedural safeguards are alone enough to establish the existence of a substantive liberty interest. 459 U.S. at 471, 103 S.Ct. at 871.

As the majority opinion acknowledges, the defendants do not contend that the Prison Residents Handbook containing the rule on which Stephany relies was promulgated without legal authority. *Supra* at 500 n. 3. In this summary judgment posture, we must therefore assume that the handbook was intended to bind the defendant prison officials. Since we are dealing with the intention of the promulgating authorities, the starting point is the language of the rule, insofar as it deals substantively with administrative segregation. It reads:

D. Administrative Segregation:

Definition: The confinement of an inmate to his own or another cell pursuant to administrative review consistent with the policy outlined below.

1. Indications for Use:

Administrative segregation may be considered when:

(a) The security of the institution and/or the safety of any individual(s) is immediately threatened.

(b) Upon recommendation of a physician or mental health caseworker that, in his or her professional opinion, it would be in the best interests of said inmate(s) to be confined.

(c) When an inmate engages in behaviors that are immediately threatening to his/her life and/or health.

(d) When an inmate requests protective custody.

The plain meaning of the language is that the four listed instances are the *only* instances in which administrative segregation may even be considered. The majority reads the regulation as if it was written "Administrative segregation may be imposed for any reason whatsoever including but not limited to the following." In order to effectively rewrite the regulation the majority does exactly what Justice Rehnquist proposed in *Arnett v. Kennedy* and what the other eight justices now prohibit; it looks to the procedural features of the rule as a means of narrowing its substance. If the rule had *no* procedural features it would still, under the method of analysis required by the Supreme Court's procedural due process caselaw, trigger federal due process protections.

To test this hypothesis let us imagine the substantive language of the rule in another context. If an employee of the Berks County Prison were charged with misconduct for imposing administrative segregation for reasons other than the four set forth in the Handbook, could he plausibly argue that the rule authorized him to do so? If he brought a section 1983 action seeking to restrain the prison authorities from disciplining him, would we accept as plausible the contention that the rule doesn't fairly notify him that it confines his discretion? I submit that the answer to both the preceding questions is plainly, no. Clear to anyone who is willing to read ordinary language is that the legislative authority which promulgated the Berks County Prison rules intended to confine consideration of administrative segregation to the four designated instances. The rule is unequivocally a particularized standard or criterion to guide the prison officials' decisionmaking on that subject matter. *See Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983); *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 467, 101 S.Ct. 2460, 2465, 69 L.Ed.2d 158 (1981)

(Brennan, J., concurring). The rule places substantive limitations on official discretion to confine prisoners to effective solitary confinement, creating a state law expectation which triggers due process scrutiny.

The substantive provisions which in *Hewitt v. Helms* were held by the Supreme Court to confine prison officials' discretion regarding administrative detention provide an interesting comparison. Those regulations read:

An inmate who has allegedly committed a Class I Misconduct may be placed in Close or Maximum Administrative Custody upon approval of the officer in charge of the institution, not routinely but based upon his assessment of the situation and the need for control pending application of procedures under § 95.103 of this title.

37 Pa.Code § 95.104(b)(1) (1978).

An inmate may be temporarily confined to Close or Maximum Administrative Custody in an investigative status upon approval of the officer in charge of the institution where it has been determined that there is a threat of a serious disturbance, or a serious threat to the individual or others.

37 Pa.Code § 95.104(b)(3) (1978).

The *Helms* Court also noted an Administrative Directive of the State Bureau of Correction providing that when the State Police have been summoned to an institution:

Pending arrival of the State Police, the institutional representative shall:

1. Place all suspects and resident witnesses or complainants in such custody, protective or otherwise, as may be necessary to maintain security.

Pa.Admin.Dir. BC–ADM004, § IV B (1975). The substantive provision applicable to the Berks County Prison is actually clearer in confining the discretion of the prison officials in imposing administrative segregation than are the regulations which resulted in a finding of a protectible state law expectation in *Hewitt v. Helms.* True enough, as the majority opinion notes, Justice Rehnquist refers in *Hewitt v. Helms* to

additional language in the regulation mandating notice and hearing. The most that can be read into the reference to mandatory procedures, however, is that they were relied upon as an aid to the discernment of the intention of the Pennsylvania promulgators of the regulations, which are considerably less explicit than the rule with which we deal. It cannot reasonably be maintained that in the absence of accompanying mandatory procedural rules *Hewitt v. Helms* requires that such plain language be disregarded. Such an interpretation would mean that the *Hewitt v. Helms* opinion adopted the Rehnquist *Arnett v. Kennedy* position. Justice White and Justice Powell both expressly disavowed that position, but nevertheless joined in the *Hewitt v. Helms* opinion, and cannot be deemed to have been converted to the *Arnett v. Kennedy* heresy. Moreover such an interpretation is inconsistent with the explicit rejection by eight justices of the *Arnett v. Kennedy* approach in *Cleveland Board of Education v. Loudermill.* Had *Hewitt v. Helms* been intended to mean what the majority reads into it, the case would have been mentioned explicitly in *Loudermill* and rejected.

One could, of course, justify the majority's analysis by taking the position that the Supreme Court's carefully crafted distinction between substantive entitlements and procedural safeguards is simply inapplicable to the prison situation. That may not be done, however, without disregarding the Supreme Court's caselaw on the subject. Indeed, *Hewitt v. Helms,* on which the majority relies, is in this respect directly in point, for the court first made the determination that under Pennsylvania law there was an expectation with respect to administrative segregation, and only then proceeded to apply the balancing test required by *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); 459 U.S. at 472–73, 103 S.Ct. at 871–72.

The administrative segregation rule applicable to the Berks County Prison sets forth four particularized instances in which such segregation is permissible, and authorizes it in no other instances. The criteria are objective and the language is mandatory. Attributing to the drafters of the rule an intention to authorize administrative segregation in the totally unfettered discretion of prison officials is preposterous. Since the rule clearly limits that discretion, it creates a substantive state law expectation to which federal procedural due process standards apply. The summary judgment in this case was clear error, and should be reversed.