Robert **KIRCHGESSNER,** Jr., et al., Plaintiffs,

v.

Robert N. **WILENTZ, et al., Defendants.**

Civ. A. No. 94–5973 (AJL).

United States District Court, D. New Jersey.

April 28, 1995.

David I. Fox, Craig S. Gumpel, Fox and Fox, Newark, NJ, for plaintiff Probation Ass'n of New Jersey.

A.J. Fusco, Jr., P.A., Passaic, NJ, for Kirchgessner plaintiffs.

Deborah T. Poritz, Atty. Gen., Robert H. Stoloff, Asst. Atty. Gen., Christian Arnold,

Deputy Atty. Gen., Benjamin Clarke, Asst. Atty. Gen., Trenton, NJ, for defendants.

OPINION

LECHNER, District Judge:

This is a consolidated action consisting of an action brought by seven named probation officers including one Robert Kirchgessner, Jr.[1] (the "Kirchgessner Plaintiffs"), as members of a putative class of all present and future probation officers employed by the State of New Jersey, *see* Kirchgessner Plaintiffs' Verified Class Action Complaint and Jury Demand (the "Kirchgessner Complaint"), and Exhibits A through C, and an action brought by the Probation Association of New Jersey ("PANJ"), the employee representative for some 1500 probation employees throughout New Jersey. *See* PANJ's Verified Complaint, Civil Action Number 94-6375 (AJL) (the "PANJ Complaint"), and Exhibits A through D. The Kirchgessner Plaintiffs and PANJ (collectively, the "Plaintiffs") commenced their actions against the seven justices (the "Chief Justice" and the "Associate Justices" or the "Defendants") of the Supreme Court of the State of New Jersey (the "New Jersey Supreme Court"), in their official capacities, seeking by way of injunctive relief to enjoin the policy of the New Jersey Supreme Court prohibiting probation officer membership in police organizations. Jurisdiction is alleged pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1343 and 29 U.S.C. § 102. Kirchgessner Complaint, ¶¶ 2-3; PANJ Complaint, ¶ 4.

On 15 December 1994, the Kirchgessner Plaintiffs made an application for an accelerated return date and a preliminary injunction (the "Preliminary Injunction Application"). *See* transcript of Preliminary Injunction Application, dated 15 December 1994 (the "Preliminary Injunction Application Tr."). Counsel for the Defendants was given notice of the Preliminary Injunction Application on 14 December 1994. *Id.* at 3.

In light of the limited opportunity counsel for the Defendants had to present opposition and because the Kirchgessner Plaintiffs sought to enjoin the New Jersey Supreme Court concerning an opinion issued more than five months earlier on 8 July 1994 (the "8 July 1994 Opinion"), attached as Exhibit A to the Kirchgessner Complaint and Exhibit C to the PANJ Complaint, the Preliminary Injunction Application was denied on 15 December 1994. Preliminary Injunction Application Tr. at 3-5. The Kirchgessner Plaintiffs were instructed to proceed with their motion for injunctive relief pursuant to Rule 12 N, Appendix N of the General Rules Governing the United States District Court for the District of New Jersey. *Id.* at 4-6.

On 3 January 1995, PANJ filed an order to show cause (the "Order to Show Cause"), seeking a declaratory judgment, preliminary and permanent injunction against the Chief Justice and the Associate Justices in connection with the 8 July 1994 Opinion. A letter was forwarded to counsel for PANJ, with copies to counsel for the Kirchgessner Plaintiffs and counsel for the Defendants, dated 4 January 1995 (the "4 January 1995 Letter") stating:

> As explained on 15 December 1994 to counsel in the *Kirchgessner* matter, based upon the chronology of the events related to these cases, as well as the timing of the applications for injunctive relief, ... there is no reason to proceed in an emergent manner. The relief sought requires deliberate action and the [D]efendants should have a fair and adequate opportunity to respond to a request for injunctive relief, as sought in each of these matters.

4 January 1995 Letter at 2. Additionally, the 4 January 1995 Letter advised that it was the court's inclination to consolidate the matters and have the Kirchgessner Plaintiffs and PANJ jointly brief the injunctive relief issue to avoid a duplication of effort. *Id.*

At a status conference, dated 12 January 1995, the action commenced by PANJ, was consolidated with the matter filed by the Kirchgessner Plaintiffs. *See* Order of Consolidation, dated and filed 12 January 1995. Thereafter, a return date and hearing were

---

1. The other named plaintiffs include Michael Kranyak, Andy Kafel, Jack Tomaselli, Charles Bene, Maureen Cool and Bill Sheeran.

scheduled for 17 April 1995 (the "17 April Hearing"). *See* transcript of the 17 April Hearing, dated 17 April 1995 (the "17 April Hearing Tr.").

Currently before the court is the Plaintiffs' motion for a preliminary injunction to enjoin the New Jersey Supreme Court, the Chief Justice and the Associate Justices, from enforcing a policy, as articulated in the 8 July 1994 Opinion; this policy prohibits probation officer membership in law enforcement organizations. Also before the court is the cross-motion by the Chief Justice and the Associate Justices to dismiss for failure to state a claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)").[2]

For the reasons set forth below, the motion by Plaintiffs for a preliminary injunction is denied. The cross-motion by the Chief Justice and the Associate Justices to dismiss is granted as to the Plaintiffs' Federal causes of action; supplemental jurisdiction is not exercised concerning the Plaintiffs' state law causes of action.

*Facts*

In October and November 1993, PANJ passed a referendum to affiliate itself with the Policeman Benevolent Association of New Jersey (the "State PBA"). PANJ Complaint, ¶ 28. In September of 1994, the State PBA agreed to become affiliated with the PANJ, if such affiliation was not prohibited by law. *Id.,* ¶ 30. Additionally, many of the Plaintiffs were, at that time, members of the Fraternal Order of Police (the "FOP").

Kirchgessner Complaint, ¶¶ 9–14; PANJ Complaint, ¶ 32.

On 3 March 1994, in response to a request made by the Chief Probation Officers' Association, the New Jersey Supreme Court announced it would review its longstanding policy prohibiting probation officer membership in law enforcement organizations, namely the State PBA and the FOP. *See* Letter from the New Jersey Supreme Court, dated 3 March 1994 (the "3 March 1994 Letter"), attached as Exhibit A to the PANJ Complaint at 1. The New Jersey Supreme Court appointed retired Superior Court Judge Paul R. Huot, as a special master (the "Special Master"), to develop a factual record to aid in its review of this matter. *Id.*

In the 3 March 1994 Letter, the New Jersey Supreme Court explained: "In the meantime, the present policy remains in effect: probation officers shall not become members of any law enforcement organization.... [F]or the time being the policy shall not require those probation officers who are currently members of [the] FOP to resign." *Id.* at 1–2. Additionally, the 3 March 1994 Letter stated: "The [Supreme Court of New Jersey] wishes to make clear that it recognizes the probation officers' constitutional right to have representatives of their own choosing in connection with collective negotiations." *Id.* at 2.

### A. The Report of the Special Master

On 28 March 1994, the Special Master issued his report (the "Report of the Special

2. In support of their motion for a preliminary injunction and in opposition to the motion to dismiss by the Chief Justice and the Associate Justices, the Plaintiffs submitted: PANJ's Supplemental Brief in Support of Order to Show Cause for Preliminary Injunction (the "PANJ Brief"); Brief in Support of Kirchgessner Plaintiffs' Motion for a Preliminary Injunction (the "Kirchgessner Brief"); Reply Brief of Plaintiff, Probation Association of New Jersey's Order to Show Cause for Preliminary Injunction and in Opposition to Defendants' Motion to Dismiss Plaintiff's Complaint (the "PANJ Reply Brief"); Reply Brief in Support of Kirchgessner Plaintiffs' Motion for a Preliminary Injunction and in Opposition to Defendant's Motion to Dismiss Plaintiffs' Complaint (the "Kirchgessner Reply Brief"); Kirchgessner Plaintiffs' Appendix; Affidavit of Rich Walen; Affidavit of Maureen Cool;

Affidavit of George Christie in Support of Plaintiff Probation Association of New Jersey's Order to Show Cause for Preliminary Injunction and in Opposition to Defendants' Motion to Dismiss Plaintiff's Complaint; Plaintiff Probation Association of New Jersey's Appendix in Support of Order to Show Cause for Preliminary Injunction and in Opposition to Defendants' Motion to Dismiss Plaintiff's Complaint, Volumes I and II.

In opposition to Plaintiffs' motion for preliminary injunction and in support of their motion to dismiss, the Chief Justice and the Associate Justices submitted: Brief in Support of Motion to Dismiss and in Opposition to Motion for Preliminary Injunction (the "Defendants Brief"); Defendants' Letter Brief Addendum in Support of Motion to Dismiss and Opposition to Motion for Preliminary Injunction (the "Defendants Addendum"); Affidavit of Mark A. Rosenbaum.

Master"), attached as Exhibit B to the Kirchgessner Complaint and the PANJ Complaint, concerning probation officer membership in law enforcement organizations and the proposed affiliation of PANJ with the State PBA. According to the Special Master, there were five questions submitted by the New Jersey Supreme Court for which it sought a factual record and recommended findings of fact. Report of the Special Master at 2. These questions were:

(1) What impact, if any, will membership of probation officers in the [State PBA] or the [FOP] have on the probation function?

(2) Will the affiliation of PANJ with the State PBA result in membership in the PBA of probation officers who are members of PANJ?

(3) What is the present number of probation officers who are members of the FOP and what have their activities been in connection with that organization?

(4) To what extent, if any, may probation officers become involved in or be seen as supporting political activity as a result of membership in either [the State PBA] or [the FOP]?

(5) Does the legislation (N.J.S.A. [§] 34:13A–5.3) prohibiting, subject to certain exceptions, police officers from joining an employee organization that admits non police to membership [sic] imply any legislative policy related to the potential impact on non-police members of such an organization?

*Id.*

The Report of the Special Master explained:

This report does *not* and the assignment of th[e] [S]pecial [M]aster *was not intended* to make findings concerning the question of whether a probation officer was a "law enforcement officer", nor the question of the propriety or right of any "union" to be a representative for collective bargaining purposes of probation officers nor the question of the right of probation officers to join any particular union.

*Id.* (emphasis in original).

With regard to the impact of membership in police organizations on the probation func-

tion, the Special Master determined that the testimony he heard and the evidence submitted "[were] not such that a true factual determination can be made." *Id.* at 3. According to the Special Master: "While a far more detailed and intense study would be required to come to a fully sustainable conclusion based upon empirical data rather than opinions, it would appear that membership in the [State PBA] or [the FOP] will not affect the *functions of probation.*" *Id.* at 5 (emphasis added).

The Special Master explained that there "is no evidence one way or the other" concerning the impact on the function of probation, as well as on the impact on individual probation officers from police officer association membership. *Id.* at 5–6. Instead, the Special Master stated these determinations turn upon the decision maker's view of human nature

as able to withstand the subtle bribery of friendship or steadfastness in living up to the moral and ethical standards required by a particular employment ... [and] [t]he belief in the professionalism or lack thereof of probation officers as a whole, or an individual probation officer, in the performance of duty and adherence to oath.

*Id.*

The Special Master was similarly unable to make a generalized determination concerning the impact of joining a police officer association upon the neutrality of probation officers. *Id.* at 7. The Special Master rejected testimony regarding the enhanced cooperation and coordination with law enforcement agencies which would result from membership in the State PBA or the FOP because there was already evidence of such cooperation without probation officer membership in the State PBA or the FOP. *Id.*

The Special Master concluded that affiliation with the State PBA would subject probation officers to the control and regulations of the State PBA. *Id.* at 10. "Probation officers may be placed in a position of supporting or opposing political candidates or legislation which may or may not be in the best interest of probation officers." *Id.* Addi-

tionally, the Special Master found affiliation with the State PBA could create a conflict of interest if, for example, the state offers a reward for the arrest and conviction of a defendant convicted of assaulting or killing a State PBA member. *Id.* The Special Master, however, explained:

> This, again is an area where the individual integrity and professionalism of the officer is involved. There is no determination that such membership and such action on the part of the State PBA would cause any officer to fail to properly perform his [or her] duties, it is merely the recognition of a possible consequence of affiliation.

*Id.* at 10–11.

The Special Master determined there are between 700 and 800 probation officers who are members of the FOP, and have been so for twenty years. *Id.* at 13. The Special Master pointed out that the by-laws of the FOP provides it "is strictly non-political and shall have no affiliation with any union or political action committee." *Id.* at 14. According to the Special Master, there was no evidence presented with respect to the nature and quality of the activities of the members of the FOP other than that they participate in social, non-political and non-labor oriented activities.[3] *Id.* The Special Master determined the FOP is not engaged in partisan political activity. *Id.* at 15.

The Special Master found that the State PBA does, on occasion, engage in partisan political activity. *Id.* The State PBA "may support or oppose candidates for elective office and support or oppose legislation." *Id.*

The Special Master then addressed whether N.J.S.A. § 34:13A–5.3, which prohibits police officers from joining an employee organization which admits non-police officers, implies any legislative policy concerning non-police officers joining police officer organizations. Report of the Special Master at 16.

The Special Master explained that, according to the testimony of the chairman of PERC, the purpose of the statute is to have collective bargaining without divided loyalties and to avoid problems which could arise if police and non-police were members of the same bargaining unit. *Id.* Summarizing PERC's position, the Special Master stated: "Police are to protect person and property, even in a labor dispute. The divided loyalty could arise if a police [officer] was a member of the same union as the employee who was on strike against a non[-]public employer." *Id.*

According to the Special Master, the determination of whether persons are classified as police or non-police under the statute is the function of PERC. *Id.* The Special Master explained that "PERC's jurisdiction does not extend to the employees of the judicial branch of government[,]" and that it was not his (the Special Master's) duty to interpret or apply the statute to either police officers or probation officers. *Id.*

## B. *The 8 July 1994 Opinion*

In the 8 July 1994 Opinion the New Jersey Supreme Court reaffirmed its policy of prohibiting probation officer membership in law enforcement organizations, the State PBA and the FOP in particular. 8 July 1994 Opinion at 5. The New Jersey Supreme

---

**3.** By letter, dated 11 April 1995 (the "11 April 1995 Letter"), counsel for the Defendants forwarded certain correspondence between the Administrative Office of the Courts of the State of New Jersey (the "AOC") and the Public Employees Relations Commission ("PERC"). According to an attached letter from PERC to the AOC, dated 17 March 1995, the New Jersey FOP Coalition of Probation Officers' Lodges sought to intervene on behalf of probation officers as labor representative in a labor dispute. As counsel for the Defendants point out, the above-referenced correspondence is an "indication that there is some faction of the [FOP] which seeks to be certified as a labor organization representing probation officers." 11 April 1995 Letter.

At the 17 April Hearing, the Plaintiffs explained:
> [R]egardless of whether [the FOP is] engaging in union activities or not, ... the issue is still the same in terms of their freedom of association. Is that activity going to disrupt the operation of Government in fact or appearance? ... [We have] never stated that the FOP has never engaged in union activities. In fact, they have engaged in activities for many years in terms of representing their members in disciplinary hearings before police departments and so on.

17 April Hearing Tr. at 24.

Court explained that the 8 July 1994 Opinion was "quasi-legislative, based on . . . policy considerations[,] . . . [its] knowledge of the subject matter[,] . . . [and] derived from [its] responsibility for, . . . authority over, . . . involvement with and . . . regular and continuing regulation and oversight of the Probation Division and its functions and operations." [4] *Id.* at 2. The New Jersey Supreme Court did not adopt all of the Special Master's findings, although explaining that its "disagreement [was] not fact-specific, for as [the Special Master] notes the evidence was largely insufficient . . . to reach any such determinations (or as the Special Master noted concerning the central question before us, the evidence was 'not such that a true factual determination can be made')." *Id.* at 3.

According to the New Jersey Supreme Court:

> Our decision rests on the fundamental difference between probation and police organizations. Probation is an integral part of the judiciary; everything that probation does it does as an arm of the judiciary. Among other things, it is the entity that enforces judicial orders. Given the nature and functions of probation, it must be as impartial as the rest of the judiciary, totally so and scrupulously so. Probation cannot take sides any more than a court may, and cannot be perceived as taking sides any more than a court may. . . . It has no more right to become allied with a public defender's office than with prosecutors or police. Probation represents · no special interest in society and government but one: the courts.

> Police and police organizations have but one interest and one role: law enforcement. Everything they do serves that interest: investigating crime, apprehending criminals, aiding in the prosecution and conviction of the accused, and in the imposition of punishment. The police stand

firmly and properly on one side of the scales of criminal justice—the prosecution's side.

> Put simply, the functions of police and probation—one serving the prosecution the other serving the courts—are not only different, but incompatible. Separation of the two is essential to the impartiality of the probation function and to the integrity of the judiciary.

*Id.* at 3–4.

Consistent with the 8 July 1994 Opinion, the AOC issued a directive, dated 7 December 1994, requiring all probation officers to terminate FOP membership by 1 January 1995 and prohibiting affiliation of PANJ with the State PBA. *See* Exhibit C to the Kirchgessner Complaint; Exhibit D to the PANJ Complaint

### C. *The Complaints in the Instant Action*

The Kirchgessner Complaint consists of six counts. Count One alleges the ban on probation officer membership in the FOP violates the Kirchgessner Plaintiffs' rights to freely associate, as guaranteed by the First Amendment to the United States Constitution. Kirchgessner Complaint, ¶¶ 41–42. Count two alleges the prohibition on FOP membership is a deprivation of a property right without due process, as guaranteed by the Fourteenth Amendment to the United States Constitution. *Id.*, ¶¶ 43–44. Count three alleges the Chief Justice and the Associate Justices acted under color of state law to deprive the Kirchgessner Plaintiffs rights guaranteed under the Constitution in violation of section 1983 of title 42 of the United States Code. *Id.*, ¶¶ 45–46. Count four alleges a violation of the Norris–LaGuardia Act, 29 U.S.C. § 101 *et seq.*, by denying the Kirchgessner Plaintiffs their rights to freedom of association, self-organization and designation of representatives of their own choosing. *Id.*, ¶ 47. Count five alleges a

---

4. By letter, dated 17 April 1995 (the "17 April Letter"), counsel for the Defendants explains: With respect to probation officers, N.J.S.A. [§] 2A:168–5 provides that their appointment shall be made by the Assignment Judge of the Superior Court in each county. Although, until recently, probation officers were technically on the payroll of the various counties, they have

always been subject to supervision by the [j]udiciary. Moreover, pursuant to the State Judicial Unification Act, "judicial employee" is defined as including any person employed by a county probation office, N.J.S.A. 2B:10–3, and, as of January 1, 1995, all such employees are on the State's payroll. N.J.S.A. 2B:10–4. 17 April Letter at 1.

deprivation of rights, as provided by the New Jersey State Constitution, Art. 1, ¶ 19, because the prohibition on joining the FOP is a deprivation of the Kirchgessner Plaintiffs' rights to organize through representatives of their own choosing as public employees. *Id.,* ¶¶ 48–49. Count six alleges that forbidding membership in the FOP deprived the Kirchgessner Plaintiffs of their rights to join and assist any employee organization, as provided by N.J.S.A. § 34:13A–5.3.

The PANJ Complaint consists of four counts and parallels the first, third, fifth and sixth counts of the Kirchgessner Complaint except that it focuses on the ban concerning affiliation with the State PBA. The PANJ Complaint alleges violations of the First and Fourteenth Amendments to the United States Constitution in count one. PANJ Complaint, ¶¶ 46–47. Count two alleges a violation of section 1983 of title 42 of the United States Code. *Id.,* ¶¶ 48–49. Count three alleges a deprivation of rights, as provided by the New Jersey State Constitution, Art. 1, ¶ 19. *Id.,* ¶¶ 50–52. Count four alleges a violation of N.J.S.A. § 34:13A–1 *et seq. Id.,* ¶¶ 52–53.

*Discussion*

A. *Standard For Dismissal Under Rule 12(b)(6)*

Because granting a motion under Rule 12(b)(6) can result in a dismissal at an early stage of a plaintiff's case, all allegations of a plaintiff must be taken as true and all reasonable factual inferences drawn in his or her favor. *Gomez v. Toledo,* 446 U.S. 635, 636, 100 S.Ct. 1920, 1921, 64 L.Ed.2d 572 (1980); *Piecknick v. Pennsylvania,* 36 F.3d 1250, 1255 (3d Cir.1994); *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994); *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir.1991); *Unger v. National Residents Matching Program,* 928 F.2d 1392, 1395 (3d Cir.1991); *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990); *Melikian v. Corradetti,* 791 F.2d 274, 277 (3d Cir.1986). Nevertheless, legal conclusions made in the guise of factual allegations are not given a presumption of truthfulness. *See Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 2944, 92 L.Ed.2d 209 (1986); *Haase v. Webster,* 807 F.2d 208, 215

(D.C.Cir.1986); *Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *Western Mining Council v. Watt,* 643 F.2d 618, 626 (9th Cir.), *cert. denied,* 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981); *Bermingham v. Sony Corp. of Am.,* 820 F.Supp. 834, 846 (D.N.J.1992), *aff'd,* 37 F.3d 1485 (3d Cir. 1994).

A court may dismiss a complaint for failure to state a claim where it appears beyond doubt that no relief could be granted under any set of facts which could be proved consistent with the allegations. *Hartford Fire Ins. Co. v. Merrett Underwriting Agency Management Ltd.,* —— U.S. ——, ——, 113 S.Ct. 2891, 2917, 125 L.Ed.2d 612 (1993); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Piecknick,* 36 F.3d at 1255; *ALA, Inc. v. CCAIR, Inc.,* 29 F.3d 855, 859 (3d Cir.1994); *Jordan,* 20 F.3d at 1261; *Unger,* 928 F.2d at 1395; *Markowitz,* 906 F.2d at 103; *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988); *Angelastro v. Prudential–Bache Secur., Inc.,* 764 F.2d 939, 944 (3d Cir.1985), *cert. denied,* 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985).

A Federal court reviewing the sufficiency of a complaint has a limited role. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support his [, her or its] claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Estate of Bailey v. County of York,* 768 F.2d 503, 506 (3d Cir.1985); *Bermingham,* 820 F.Supp. at 846.

Applying these principles to the instant action, the inquiry is whether the allegations made by the Plaintiffs in the Kirchgessner Complaint and the PANJ Complaint are sufficient, so as to entitle them to offer evidence in support of such allegations.

B. *Standard of Review for First Amendment Restrictions Placed on Public Employees*

■ "Even though [the Plaintiffs] work for the Government, they have not relinquished

'the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest.' " *United States v. National Treasury Employees Union,* —— U.S. ——, 115 S.Ct. 1003, 1012, 130 L.Ed.2d 964 (1995) (quoting *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)). Nonetheless, as the *National Treasury* Court explained: "In *Pickering* and a number of other cases we have recognized that Congress may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *Id.* —— U.S. at ——, 115 S.Ct. at 1012.

■■■ When making a determination concerning the validity of restraints placed on public employees, a court "must 'arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [s]tate, as an employer, in promoting the efficiency of the public services it performs through its employees.' " *Id.* at ——, 115 S.Ct. at 1012 (quoting *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734); *see also Waters v. Churchill,* —— U.S. ——, ——, 114 S.Ct. 1878, 1884, 128 L.Ed.2d 686 (1994) (plurality opinion) ("[t]o be protected, the speech must be on a matter of public concern, and the employee's interest in expressing [himself or] herself on the subject must not be outweighed by any injury the speech could cause" to the Governmental interest of promoting efficiency of its public services (citing *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983))); *Swineford v. Snyder County Pa.,* 15 F.3d 1258, 1272 (3d Cir.1994) (citing *Pickering* and *Connick* and explaining its inquiry as "whether the [government's] interests in proper departmental management outweighed [plaintiff's] interest in commenting on matters of public concern").

■ As the Supreme Court explained in *Waters:*

The key to First Amendment analysis of government employment decisions, then is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

*Waters,* —— U.S. at ——, 114 S.Ct. at 1888.

In *National Treasury,* the Court explained that it "applied *Pickering*'s balancing test only when the employee spoke '*as a citizen* upon matters of public concern' rather than '*as an employee* upon matters only of personal interest.' " *National Treasury,* —— U.S. at ——, 115 S.Ct. at 1013 (quoting *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690). According to the Court, an employee's private speech can give rise to discipline while imposing no special burden of justification on the government employer. *Id.*

With regard to speech involving a matter of public concern, the government has a burden to justify its adverse employment action. *Id.* Nonetheless, the Court "has consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large." *Waters,* —— U.S. at ——, 114 S.Ct. at 1887; *see also Connick,* 461 U.S. at 151, 103 S.Ct. at 1692 (" 'the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs' " (quoting *Arnett v. Kennedy,* 416 U.S. 134, 168, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15 (1974))).

Whether a public employee's speech addresses a matter of public concern is determined by the content, form and context of such statement. *Connick,* 461 U.S. at 148, 103 S.Ct. at 1690. "The inquiry into the protected status of speech is one of law, not fact." *Id.* at n. 7.

In *National Treasury,* the Supreme Court explained that cases where it has "applied *Pickering*'s balancing test" have generally involved disciplinary actions taken by a government employer in response to an employee's speech. —— U.S. at ——–——, 115 S.Ct. at 1012–13. In the instant action, the Plaintiffs argue that because "[h]ere the is-

sue is not one of freedom of speech, but rather one of freedom of association ... the more stringent standard of strict scrutiny must be applied." PANJ Reply Brief at 9 (arguing the New Jersey Supreme Court policy " 'cannot be justified upon a mere showing of legitimate State interest' ... [rather it] must be 'paramount, one of vital importance, and the burden is on the government to show the existence of such an interest.' " (quoting Elrod v. Burns, 427 U.S. 347, 362, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976)); see also Kirchgessner Reply Brief at 1–2 ("the freedom to associate (along with the freedom of speech) is at issue ... the United States Supreme Court has, in fact, applied the more stringent standard of strict scrutiny where the freedom of association is at issue[;] ... Plaintiffs submit that under Elrod v. Burns, the strict scrutiny test must be applied").

Notwithstanding the Plaintiffs' assertions, reliance on Elrod is misplaced. Elrod involved the discharge or threat of discharge of public employees because of their partisan political affiliation or non-affiliation. Elrod, 427 U.S. at 349, 96 S.Ct. at 2678. According to the Court, Elrod and Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), "decided that the First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless the party affiliation is an appropriate requirement for the position involved." Rutan v. Republican Party, 497 U.S. 62, 64, 110 S.Ct. 2729, 2732, 111 L.Ed.2d

52 (1990). The instant action, therefore, is distinguishable from Elrod and its progeny. Accordingly, such line of precedent does not require the application of the "strict scrutiny" test to the case at bar.[5]

The Pickering/Connick balancing test developed from cases which, like the instant action, alleged violations of public employees' associational rights. The Connick Court explained:

In all of these cases, the precedents in which Pickering is rooted, the invalidated statutes and actions sought to suppress the rights of public employees to participate in public affairs. The issue was whether government employees could be prevented or "chilled" by the fear of discharge from joining political parties and other associations that certain public officials might find "subversive."

Connick, 461 U.S. at 144–45, 103 S.Ct. at 1689 (emphasis added). The history of the Pickering/Connick balancing test, therefore, provides further support for its application in the instant case where associational rights are implicated.[6] Accordingly, the Pickering/Connick balancing test, not "strict scrutiny" will be applied in the instant case.

C. Application of the Pickering/Connick Balancing Test to the Instant Action

■ The Plaintiffs argue even under the Pickering/Connick balancing test, the governmental interest of maintaining impartiality in appearance and in fact, which underlies

---

**5.** To further support their argument for the application of the "strict scrutiny" test, the Plaintiffs rely upon Labov v. Lalley, 809 F.2d 220, 222–23 (3d Cir.1987), Mescall v. Rochford, 655 F.2d 111 (7th Cir.1981), Vorbeck v. McNeal, 407 F.Supp. 733 (E.D.Mo.1976), Police Officers' Guild, Nat'l Union of Police Officers v. Washington, 369 F.Supp. 543 (D.D.C.1973) and Atkins v. City of Charlotte, 296 F.Supp. 1068 (W.D.C.C. 1969). Kirchgessner Brief at 8–10; Kirchgessner Reply Brief at 2; PANJ Brief at 7–13; PANJ Reply Brief at 9. These cases are distinguishable from the instant action and, therefore, provide no controlling, or persuasive, authority for the Plaintiffs' position.

 As counsel for the Defendants point out, in none of these cases did the courts apply the Pickering/Connick balancing test, because such test was inapplicable. In each the courts re-

viewed restraints placed on the rights of employees to join unions and collectively bargain. Defendants Brief at 16. The Supreme Court of New Jersey "is merely prohibiting affiliation with police organizations, whether or not the organizations happens to be a union. The [8 July 1994 Opinion] merely affirmed a longstanding policy which in no way targeted unionization." Id. at 17.

**6.** Additionally, associational rights derive from other First Amendment rights including freedom of speech. Roberts v. United States Jaycees, 468 U.S. 609, 618, 622, 104 S.Ct. 3244, 3249, 3251, 82 L.Ed.2d 462 (1984) ("[T]he Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion.").

the ban on probation membership in law enforcement organizations, does not outweigh the Plaintiffs' interest in affiliating with the State PBA or the FOP. Kirchgessner Reply Brief at 3; PANJ Reply Brief at 10. Plaintiffs argue the instant ban on probation membership in law enforcement organizations is analogous to the ban struck down in *National Treasury* because it is a broad based prophylactic rule. Kirchgessner Reply Brief at 6; PANJ Reply Brief at 12.

At issue in *National Treasury* was the constitutionality of a subsection of the Ethics in Government Act which prohibited Federal employees from accepting any compensation for delivering speeches or writing articles. *National Treasury*, —— U.S. at ——, 115 S.Ct. at 1008. The ban in *National Treasury* "applie[d] even when neither the subject of the speech or article nor the person or group paying for it ha[d] any connection with the employee's official duties." *Id.*

According to the Court:

The Government's underlying concern is that [F]ederal officers not misuse or appear to misuse power by accepting compensation for their unofficial and nonpolitical writing and speaking activities. This interest is undeniably powerful, but the Government cites no evidence of misconduct related to honoraria in the vast rank and file of [F]ederal employees....

*Id.* at —— - ——, 115 S.Ct. at 1015–16. In striking the ban, the Court explained that absent a nexus limitation between speech and an employees official duties, "[a] blanket burden on the speech of 1.7 million [F]ederal employees requires a much stronger justification than the Government's dubious claim of administrative convenience." *Id.* at ——, 115 S.Ct. at 1017. .

Plaintiffs argue the Chief Justice and the Associate Justices cannot, as the Court required in *National Treasury*, " ' "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate harms in a direct and material way." ' " PANJ Reply Brief at 12 (quoting *National Treasury*, —— U.S. at ——, 115 S.Ct. at 1017 (quoting *Turner Broadcasting System*, —— U.S. ——, ——, 114 S.Ct. 2445, 2450, 129 L.Ed.2d 497 (1994))). Plaintiffs argue, despite the opportunity to present evidence to the Special Master over the five days of hearings on this matter, the Chief Justice and the Associate Justices "could not point to any specific evidence ... to support [the] claim that the 'risk' to impartiality grants them carte blanche to infringe upon First Amendment rights." PANJ Reply Brief at 11. Further, the Plaintiffs argue the Special Master "concluded that there cannot be a generalized prohibition against probation officers becoming members of or being affiliated with law enforcement organizations." *Id.*

The ban on law enforcement membership by probation officers is distinguishable from the ban in *National Treasury*. As discussed, the ban in *National Treasury* prohibited speech even when it had no relationship to a Federal employee's official duties. *National Treasury*, —— U.S. at ——, 115 S.Ct. at 1008. As counsel for the Defendants point out:

[I]n this case the New Jersey Supreme Court's ban on probation officer membership in police organizations is directly related to probation officers' employment. That is, as employees of the Judiciary, they must maintain their impartiality, in appearance and in fact. Their membership in an organization which is aligned with one side in the adversary process is inconsistent with the requirement of such impartiality.

Defendants Addendum at 3.[7]

In the instant action, the issue is not merely whether any individual probation officer will in fact lose his or her ability to be impartial as a result of law enforcement association membership. Instead, the harm which has been articulated is the appearance of partiality from permitting probation officers, who are part of the judiciary, to join the

---

7. The reason articulated by the Plaintiffs for their desire to affiliate with law enforcement associations verifies the concerns of the Chief Justice and the Associate Justices. "Affiliation with the State PBA will foster more professional and col-

laborative working relationships between probation officers, parole and police officers, which is vital to a strong and efficient criminal justice system." PANJ Brief at 2.

ranks of law enforcement.[8] As argued at the 17 April Hearing, the governmental interest underlying the 8 July 1994 Opinion is the avoidance of partiality and conflict both in fact and appearance. *See* 17 April Hearing Tr. at 5–6.[9]

Maintaining the appearance of impartiality of the judiciary is an interest of vital importance.[10] *United States Civil Serv. Comm'n v. National Assoc. of Letter Carriers,* 413 U.S. 548, 564, 93 S.Ct. 2880, 2889, 37 L.Ed.2d 796 (1973). In *United States Civil Serv. Comm'n,* the Court applied *Pickering* to uphold the constitutionality of the Hatch Act, 5 U.S.C. § 7324(a)(2), which prohibited Federal employees from taking an active role in partisan political activities. 413 U.S. at 564, 93 S.Ct. at 2889.

The Court explained that "[n]either the right to associate nor the right to participate in political activities is absolute in any event." *Id.* at 567, 93 S.Ct. at 2891. The employees of the Executive Branch

> are expected to enforce the law and execute the programs of the Government without bias or favoritism for or against any political party or group or the members thereof. A major thesis of the Hatch Act is that to serve this great end of Government—the impartial execution of laws—it is essential that [F]ederal employees, for example, not take formal positions in political parties, not undertake to play substantial roles in partisan political campaigns, and not run for office on partisan political tickets. . . .

> There is another consideration in this judgment: it is not only important that the Government and its employees in fact avoid practicing political justice, but *it is also crucial that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent.*

*Id.* at 565, 93 S.Ct. at 2890 (emphasis added).

As was explained at the 17 April Hearing, and conceded by the Plaintiffs, when weighing the competing interests between a public employer's need to have wide discretion in running an efficient operation and the speech and associational rights of its employees, the judiciary has greater concerns of maintaining its impartiality both in appearance and in fact than other branches of government. 17 April Hearing Tr. at 12–14. As explained at the 17 April Hearing:

> [T]he judiciary and each of the employees of the judiciary, not only has to be impartial, not only has to avoid conflict in fact, but has to make sure [to] avoid the appearance of . . . any partiality or any conflict. It seems that because of the separation of powers, the judiciary has to be self-policing in many respects.

*Id.* at 14.

Despite the Plaintiffs' argument to the contrary, it does not appear that the New Jersey Supreme Court's ban on law enforcement membership was, or is, at odds with the findings of the Special Master.[11] As indicat-

---

**8.** As counsel for the Defendants explained: ,

> Historically, the primary function of probation has been the enforcement of court orders, including the conditions of probation. This function includes, in appropriate circumstances, the presentation of probation violation reports to judges. This central function includes both punitive and rehabilitative components which must be balanced by the probation officer. More recently, other critical functions have been added to the responsibilities of probation officers such as case management functions including investigating for and preparing pre-sentence reports, bail reports and pretrial intervention reports, all of which are used by judges in making judicial decisions.

Defendants Brief at 5–6 (citations omitted).

With regard to the function of probation officers, the Plaintiffs state: "[T]he issue here is probation officers' constitutional First Amendment right to become members of or affiliate with law enforcement organizations of their choice. Whether the probation function is primarily rehabilitative or punitive is irrelevant to this constitutional analysis." PANJ Reply Brief at 5.

**9.** At the 17 April Hearing the Plaintiffs conceded that there was nothing "more important than the need for the judiciary to not only be impartial but to appear impartial." 17 April Hearing Tr. at 7.

**10.** As noted, the Plaintiffs do not contest this. *See supra* note 9.

**11.** It is unclear why the adherence, or lack thereof, to the Report of the Special Master is of significance to the instant analysis. In any event, this issue is addressed because the Plaintiffs have raised it numerous times in their briefs and at the 17 April Hearing.

ed, the New Jersey Supreme Court explained that, it did not adopt all of the findings of the Special Master. 8 July Opinion at 3. Nonetheless, as the New Jersey Supreme Court pointed out, the Special Master found "the evidence was 'not such that a true factual determination [could] be made.'" *Id.* (quoting the Report of the Special Master at 3).

Further, while the Chief Justice and the Associate Justices did not point to specific evidence of impartiality by probation officers, the Special Master repeatedly indicated that there was "no evidence one way or the other" and that he was unable to make any generalized determinations. Report of the Special Master at 5–7. At the 17 April Hearing the Plaintiffs again pointed to a lack of "empirical" or "objective" evidence to support the 8 July 1994 Opinion. 17 April Hearing Tr. at 15–18 ("although [the Plaintiffs] wouldn't say the [New Jersey] Supreme Court took its views out of thin air, [we] can say there is just no basis for it, except theory"). As also explained at the 17 April Hearing:

> [T]he only way you could have empirical data is when partiality is developed, when conflict is developed and at that point it is too late, the system is brought down under its own weight ... there can[not] be any basis, other than for theory unless the system went so awry, unless the system was so rife with corruption or partiality that it [the evidence] would [then] be[come] objective....
>
> What makes the judiciary viable in any governmental setting is th[e] distance that impartiality and the appearance of impartiality ... [create and which] people can rely upon....

*Id.* at 15–18. *Cf. Waters,* —— U.S. at ——, 114 S.Ct. at 1887 ("Few of the examples we have discussed involve tangible, present interference with the agency's operation. The danger in them is mostly speculative.").

The Chief Justice and the Associate Justices made a reasonable determination that membership by probation officers in the State PBA and the FOP will impair the impartiality of the judiciary in fact and appearance. It appears this harm is "real" and "not merely conjectural." *National Treasury,* —— U.S. at ——, 115 S.Ct. at 1017. Further, the interest in maintaining the appearance of impartiality of the judiciary outweighs the desire of the Plaintiffs to affiliate with law enforcement organizations.[12]

Dismissal, pursuant to Rule 12(b)(6), of the Plaintiffs' claims under the First Amendment is appropriate. As argued by counsel for the Defendants, in light of the "paramount interest in maintaining an independent and impartial [j]udiciary, the prohibition of probation officer membership in police organizations is of the type that a public employer may reasonably place on its employees...." Defendants Brief at 9. *See National Treasury,* —— U.S. at ——, 115 S.Ct. at 1012; *Waters,* —— U.S. at ——, 114 S.Ct. at 1888; *Connick,* 461 U.S. at 142, 103 S.Ct. at 1687; *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734; *Swineford,* 15 F.3d at 1272. Moreover, it appears beyond doubt that no relief could be granted under any set of facts which could be proved consistent with the allegations of First Amendment violations, as set forth in the Kirchgessner Complaint and the PANJ Complaint. *Hartford Fire,* —— U.S. at ——, 113 S.Ct. at 2917; *Hishon,* 467 U.S. at 73, 104 S.Ct. at 2232; *Conley,* 355 U.S. at 45–46, 78 S.Ct. at 101–102; *Piecknick,* 36 F.3d at 1255; *ALA,* 29 F.3d at 859; *Jordan,* 20 F.3d at 1261; *Unger,* 928 F.2d at 1395; *Markowitz,* 906 F.2d at 103; *Ransom,* 848 F.2d at 401; *Angelastro,* 764 F.2d at 944. Accordingly,

---

12. As previously quoted:

Given the nature and functions of probation, it must be as impartial as the rest of the judiciary, totally so and scrupulously so. Probation cannot take sides any more than a court may, and cannot be perceived as taking sides any more than a court may. ... It has no more right to become allied with a public defender's office than with prosecutors or police. Probation represents no special interest in society and government but one: the courts.

Police and police organizations have but one interest and one role: law enforcement. Everything they do serves that interest: investigating crime, apprehending criminals, aiding in the prosecution and conviction of the accused, and in the imposition of punishment. The police stand firmly and properly on one side of the scales of criminal justice—the prosecution's side.

8 July 1994 Opinion at 4.

the motion to dismiss the Plaintiffs' claims under the First Amendment, as alleged in counts one of the Kirchgessner Complaint and the PANJ Complaint, is granted pursuant to Rule 12(b)(6).

### D. *Other Federal Claims*

As indicated, in addition to their First Amendment claims, Plaintiffs also allege the New Jersey Supreme Court policy violates their due process rights under the Fourteenth Amendment, the Norris–LaGuardia Act, and section 1983 of title 42 of the United States Code (collectively, the "Federal Claims").

### 1. *Due Process*

Plaintiffs allege in count two of the Kirchgessner Complaint and in count one of the PANG Complaint the Chief Justice and the Associate Justices, by their ban on affiliation with law enforcement organizations, have deprived the Plaintiffs of a property right without due process as guaranteed by the Fourteenth Amendment to the United States Constitution. Kirchgessner Complaint, ¶¶ 43–44; PANJ Complaint, ¶¶ 46–47.

■ The determination of whether a plaintiff has adequately alleged a violation of the Fourteenth Amendment's Due Process Clause involves two steps. First, it must be determined whether Plaintiffs have alleged interference with a protected liberty interest. *See Meachum v. Fano,* 427 U.S. 215, 223, 96 S.Ct. 2532, 2537, 49 L.Ed.2d 451 (1976); *Stephany v. Wagner,* 835 F.2d 497, 499 (3d Cir.1987), *cert. denied,* 487 U.S. 1207, 108 S.Ct. 2851, 101 L.Ed.2d 888 (1988); *Mims v. Shapp,* 744 F.2d 946, 949 (3d Cir.1984). Second, it must be determined whether the pro-

cedures employed by the state to protect that liberty interest were constitutionally inadequate. *See Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); *Mims,* 744 F.2d at 949.

■ With respect to the first of these steps, the Supreme Court has stated: "Liberty interests protected by the Fourteenth Amendment may arise from two sources— the Due Process Clause itself and the laws of the states." *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868–869, 74 L.Ed.2d 675 (1983); *see Board of Pardons v. Allen,* 482 U.S. 369, 373, 107 S.Ct. 2415, 2418, 96 L.Ed.2d 303 (1987); *Stephany,* 835 F.2d at 499.

■ The Plaintiffs have not alleged a protected liberty interest nor that such interest was deprived without due process of law. The Plaintiffs argue if they do not follow the policy of the New Jersey Supreme Court, "they are threatened with termination from their jobs.... Such termination clearly threatens the [P]laintiffs' property interests." Kirchgessner Brief at 11. As counsel for the Defendants pointed out: "[P]laintiffs do not allege ... that if any probation officers are terminated for a violation of the policy that they would not be given a hearing on that action. It is the termination of employment which must be attended by due process, not the announcement of the policy." Defendants Brief at 32–33.

It appears, therefore, beyond doubt that no relief could be granted under any set of facts which could be proved consistent with the allegations of due process violations, as set forth in the Kirchgessner Complaint and the PANJ Complaint.[13] *Hartford Fire,* ——

---

13. Plaintiffs also contend their due process rights were violated by the New Jersey Supreme Court "by deciding this case since the circumstance impose a risk of bias or prejudice on the part of the [New Jersey] Supreme Court (which acted as both participant-respondent and the purported arbiter)." Kirchgessner Brief at 12. Plaintiffs argue: " '[D]ue process demands impartiality on the part of those who function in judicial or quasi-judicial capacities.' " Kirchgessner Brief at 12 (quoting *Schweiker v. McClure,* 456 U.S. 188, 195, 102 S.Ct. 1665, 1670, 72 L.Ed.2d 1 (1982)). As mentioned, however, the 8 July 1994 Opinion was issued by the New Jersey Supreme

Court in its "quasi-legislative" capacity. 8 July 1994 Opinion at 2.

Plaintiffs, do not appear to contest that the 8 July 1994 Opinion was "quasi-legislative." Instead, according to Plaintiffs: "to argue that due process (which is, in essence, fairness) is inapplicable to the [New Jersey] State Supreme Court is improper and misguided." Kirchgessner Reply Brief at 11. Plaintiffs have provided no authority, however, for their argument that it was a due process violation for the New Jersey Supreme Court to set the policy for the employees of the judiciary. As discussed, conclusory assertions, such as those advanced here by the Plaintiffs, are

U.S. at ——, 113 S.Ct. at 2917; *Hishon,* 467 U.S. at 73, 104 S.Ct. at 2232; *Conley,* 355 U.S. at 45–46, 78 S.Ct. at 101–102; *Piecknick,* 36 F.3d at 1255; *ALA,* 29 F.3d at 859; *Jordan,* 20 F.3d at 1261; *Unger,* 928 F.2d at 1395; *Markowitz,* 906 F.2d at 103; *Ransom,* 848 F.2d at 401; *Angelastro,* 764 F.2d at 944. Accordingly, the motion to dismiss the Plaintiffs' claims under the Fourteenth Amendment, as alleged in count two of the Kirchgessner Complaint and count one of the PANJ Complaint, is granted pursuant to Rule 12(b)(6).

### 2. *Norris–LaGuardia Act*

■ Count four of the Kirchgessner Complaint alleges a violation of the Norris–LaGuardia Act, 29 U.S.C. § 101 *et seq.,* by denying the Kirchgessner Plaintiffs their rights to freedom of association, self-organization and designation of representatives of their own choosing. Kirchgessner Complaint, ¶ 47. The Norris–LaGuardia Act provides:

> No court of the United States shall have jurisdiction to issue any restraining order or … injunction … to prohibit any person or persons participating … whether singly or in concert … from … [among other things] refusing to perform any work [and] … [a]ssembling peaceably to … organize … in promotion of their interests in a labor dispute.

Norris–LaGuardia Act, 29 U.S.C. § 104.

As counsel for the Defendants argues: "Plaintiffs offer no explanation as to how [the New Jersey] Supreme Court's policy, which is not issued in its judicial capacity, could possibly violate the Norris–LaGuardia Act." Defendants Brief at 32. According to the Plaintiffs, "assuming *arguendo* that the [D]efendants are correct, … it is the *policy* considerations of the Norris–LaGuardia Act which are significant." Kirchgessner Reply Brief at 9.

It appears the Plaintiffs are arguing that even though the instant action neither implicates their right to representation by a union nor their right to collectively bargain, a right

for them to join a law enforcement organization should be recognized as within the "policy" of the Norris–LaGuardia Act. The Plaintiffs are unable to point to any authority to support such assertion.

It appears beyond doubt that no relief could be granted under any set of facts which could be proved consistent with the allegations of a violation of the Norris–LaGuardia Act as set forth in the Kirchgessner Complaint. *Hartford Fire,* —— U.S. at ——, 113 S.Ct. at 2917; *Hishon,* 467 U.S. at 73, 104 S.Ct. at 2232; *Conley,* 355 U.S. at 45–46, 78 S.Ct. at 101–102; *Piecknick,* 36 F.3d at 1255; *ALA,* 29 F.3d at 859; *Jordan,* 20 F.3d at 1261; *Unger,* 928 F.2d at 1395; *Markowitz,* 906 F.2d at 103; *Ransom,* 848 F.2d at 401; *Angelastro,* 764 F.2d at 944. Therefore, the motion to dismiss the Plaintiffs' claim under the Norris–LaGuardia Act, as alleged in count four of the Kirchgessner Complaint, is granted pursuant to Rule 12(b)(6).

### 3. *42 U.S.C. § 1983*

■ Count three of the Kirchgessner Complaint and count two of the PANG Complaint allege the Chief Justice and the Associate Justices acted under color of state law to deprive the Plaintiffs their rights guaranteed under the Constitution in violation of section 1983 of title 42 of the United States Code. Kirchgessner Complaint, ¶¶ 45–46; PANG Complaint, ¶¶ 48–49. Section 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

"In order to prevail in a [section] 1983 action, a plaintiff must establish (1) that 'the

not afforded any presumption of truthfulness sufficient to survive a Rule 12(b)(6) motion. *See Papasan,* 478 U.S. at 286, 106 S.Ct. at 2944;

*Haase,* 807 F.2d at 215; *Briscoe,* 663 F.2d at 723; *Western Mining Council,* 643 F.2d at 626; *Bermingham,* 820 F.Supp. at 846.

conduct complained of was committed by a person acting under color of state law' and (2) that the 'conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" *Shaw v. Strackhouse,* 920 F.2d 1135, 1141–42 (3d Cir.1990) (quoting *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)).

In light of the foregoing discussion, the Plaintiffs are unable to establish the second requirement for the maintenance of a claim under section 1983. It appears, therefore, beyond doubt that no relief could be granted under any set of facts which could be proved consistent with the allegations of section 1983 violations as set forth in the Kirchgessner Complaint and the PANJ Complaint. *Hartford Fire,* —— U.S. at ——, 113 S.Ct. at 2917; *Hishon,* 467 U.S. at 73, 104 S.Ct. at 2232; *Conley,* 355 U.S. at 45–46, 78 S.Ct. at 101–102; *Piecknick,* 36 F.3d at 1255; *ALA,* 29 F.3d at 859; *Jordan,* 20 F.3d at 1261; *Unger,* 928 F.2d at 1395; *Markowitz,* 906 F.2d at 103; *Ransom,* 848 F.2d at 401; *Angelastro,* 764 F.2d at 944. Accordingly, the motion to dismiss the Plaintiffs' claims under section 1983 of title 42, as alleged in count three of the Kirchgessner Complaint and count two of the PANJ Complaint, is granted pursuant to Rule 12(b)(6).

### E. *State Law Claims*

■■■ As discussed, in addition to the Federal Claims, the Plaintiffs allege the Chief Justice and the Associate Justices have violated their rights under New Jersey state law (the "State Law Claims").

Count five of the Kirchgessner Complaint and count three of the PANJ Complaint allege a deprivation of rights as provided by the New Jersey State Constitution, Art. 1, ¶ 19. Plaintiffs allege that the prohibition on affiliation with the State PBA and the FOP is a deprivation of the Plaintiffs' right to organize through representatives of their own choosing as public employees. Kirchgessner Complaint, ¶¶ 48–49; PANJ Complaint, ¶¶ 50–52. Additionally, count six of the Kirchgessner Complaint and count four of the PANJ Complaint allege forbidding membership in the State PBA and the FOP deprived the Plaintiffs of the right to join and assist any employee organization, as guaranteed by N.J.S.A. § 34:13A–5.3. Kirchgessner Complaint, ¶¶ 50–52; PANJ Complaint, ¶¶ 52–53.

Supplemental jurisdiction enables Federal courts to hear state law claims over which there is no independent basis of jurisdiction. 28 U.S.C. § 1367; *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 349, 108 S.Ct. 614, 618, 98 L.Ed.2d 720 (1988); *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); *Mars Inc. v. Kabushiki–Kaisha Nippon Conlux,* 24 F.3d 1368, 1374 (Fed.Cir.1994). Supplemental jurisdiction depends upon the existence of subject matter jurisdiction over other Federal claims in the action. Section 1367(c) permits a court to decline supplemental jurisdiction when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see also, Carnegie–Mellon,* 484 U.S. at 350, 108 S.Ct. at 619 (when the Federal-law claims have dropped out of the lawsuit and only state-law claims remain, the Federal court should decline the exercise of jurisdiction by dismissing the case without prejudice).

In the instant case, the Plaintiffs base Federal jurisdiction upon 42 U.S.C. § 1983, 28 U.S.C. § 1343 and 29 U.S.C. § 102. Kirchgessner Complaint, ¶¶ 2–3; PANJ Complaint, ¶ 4. Because dismissal pursuant to Rule 12(b)(6) is granted as to the Federal Claims, such claims can no longer support supplemental jurisdiction in this court. 28 U.S.C. § 1367(a), (c).

In the instant action, there appears to be no independent basis for jurisdiction over the State Law Claims. It appears the Plaintiffs reside in New Jersey. Kirchgessner Complaint, ¶ 6; PANJ Complaint, ¶¶ 9–14. The Chief Justice and the Associate Justices are sued in their official capacity, and are all alleged to maintain chambers in the state of New Jersey. Kirchgessner Complaint, ¶¶ 7–13; PANJ Complaint, ¶¶ 15–21. In fact, it appears all are residents of New Jersey. Plaintiffs do not allege diversity jurisdiction; it appears they have no basis for such an allegation. Because no other ground for sup-

plemental jurisdiction is alleged, nor does any appear appropriate, supplemental jurisdiction will not be exercised in the instant case. *Carnegie–Mellon,* 484 U.S. at 350 n. 7, 108 S.Ct. at 619 n. 7 (citing *Gibbs,* 383 U.S. at 725, 86 S.Ct. at 1138); *Angst v. Mack Trucks, Inc.,* 969 F.2d 1530, 1535 (3d Cir. 1992); *Fuentes v. South Hills Cardiology,* 946 F.2d 196, 198 n. 3 (3d Cir.1991); 28 U.S.C. § 1367(c)(3). Accordingly, the State Law Claims alleged in counts five and six of the Kirchgessner Complaint and in counts three and four of the PANJ Complaint are dismissed without prejudice.

### F. Preliminary Injunction

The Circuit has established, that the decision to issue a preliminary injunction is based upon a review of four factors:

(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.

*Gerardi v. Pelullo,* 16 F.3d 1363, 1373 (3d Cir.1994); *see also S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 374 (3d Cir.1992); *Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co.,* 963 F.2d 628, 632 (3d Cir.1992); *Opticians Ass'n of Am. v. Independent Opticians of Am.,* 920 F.2d 187, 191–92 (3d Cir. 1990); *Alessi v. Pennsylvania, Dept. of Pub. Welfare,* 893 F.2d 1444, 1447 (3d Cir.1990); *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 799 (3d Cir.1989); *Fechter v. HMW Indus., Inc.,* 879 F.2d 1111, 1116 (3d Cir.1989); *Apollo Technologies v. Centrosphere Indus.,* 805 F.Supp. 1157, 1191 (D.N.J.1992); *Glenside West Corp. v. Exxon Co., U.S.A.,* 761 F.Supp. 1118, 1132 (D.N.J. 1991); *CPC Int'l, Inc. v. Caribe Food Distribs.,* 731 F.Supp. 660, 664 (D.N.J.1990); *Bascom Food Prods. Corp. v. Reese Finer Foods, Inc.,* 715 F.Supp. 616, 624 (D.N.J. 1989).

Of these four requirements, the Circuit has placed particular weight on the probability of irreparable harm and the likelihood of suc-

cess on the merits, stating: " '[W]e cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites are absent.' " *Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 197 (3d Cir.1990) (quoting *In re Arthur Treacher's Franchisee Litigation,* 689 F.2d 1137, 1143 (3d Cir.1982)); *see also Instant Air,* 882 F.2d at 800; *Morton v. Beyer,* 822 F.2d 364, 367 (3d Cir.1987); *Freixenet, S.A. v. Admiral Wine & Liquor Co.,* 731 F.2d 148, 151 (3d Cir.1984).

Significantly, the Circuit has repeatedly stated that a "grant of injunctive relief is an extraordinary remedy which should be granted only in limited circumstances." *Frank's GMC Truck Center, Inc. v. General Motors Corp.,* 847 F.2d 100, 102 (3d Cir.1988); *accord Chez Sez III Corp. v. Union,* 945 F.2d 628, 634 (3d Cir.1991), *cert. denied,* 503 U.S. 907, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992); *Instant Air,* 882 F.2d at 800; *United States v. Philadelphia,* 644 F.2d 187, 191 n. 1 (3d Cir.1980); *see also Driscoll Potatoes, Inc. v. N.A. Produce Co.,* 765 F.Supp. 174, 176 (D.N.J.1991).

In light of the dismissal of all counts of the Kirchgessner Complaint and all counts of the PANJ Complaint, the motion by Plaintiffs for a preliminary injunction is denied as moot.

### G. Class Certification for the Kirchgessner Plaintiffs

Rule 23(c)(1) of the Federal Rules of Civil Procedure ("Rule 23") provides: "As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained." Fed.R.Civ.P. 23(c)(1). As the Fifth Circuit in *Floyd v. Bowen,* 833 F.2d 529, 534 (5th Cir.1987) explained:

The timing requirements of Rule 23 are not absolute. Professor Wright explains that "[t]he court always is empowered to make a determination on the merits irrespective of the denomination of the suit as a class action ... the propriety of that inquiry is limited only by concerns of whether the class determination should be postponed until after the merits determination." C. Wright, A. Miller, and M.

Cane, 7 Federal Practice & Procedure, 1785 at 128 (footnote omitted) (1986). Indeed ... the class action litigation may be halted by a ... motion to dismiss or by a ... motion for summary judgment.

*Id.* (citations omitted); *see also Marx v. Centran Corp.,* 747 F.2d 1536, 1552 (6th Cir.1984) ("It has never been doubted that a complaint asserting a class action could be dismissed on the merits before determining whether the suit could be maintained as a class action."), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985); *Wright v. Schock,* 742 F.2d 541, 543–44 (9th Cir.1984) (holding that district court has discretion, under appropriate circumstances, to rule on summary judgment motion before addressing pending class certification motion).

In *Finberg v. Sullivan,* 634 F.2d 50, 64 (3d Cir.1980), the Third Circuit held, however, that the determination of the merits of a plaintiff's claims was not a valid basis to deny a motion for class certification. The Circuit explained: "In general, the certification of a class does not depend upon whether the substantive claims have any merit." *Id.* (citing *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974); *Kahan v. Rosenstiel,* 424 F.2d 161, 169 (3d Cir.), *cert. denied,* 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970)).

In *Finberg,* the plaintiff had filed a timely motion for class certification, upon which the district court took no action for nine months prior to defendants' motion for summary judgment. 634 F.2d at 64. The district court finally found the plaintiff's claims lacked merit and, therefore, reasoned that there was no purpose for class certification. *Id.* Under these circumstances, and where there was a risk that the claim of the named plaintiff would become moot, the Third Circuit held "the district court's rulings on the plaintiff's substantive claims did not constitute a valid basis for denial of class certification." *Id.*

The instant action is distinguishable from *Finberg.* The Kirchgessner Complaint includes a demand for class certification, Kirchgessner Complaint, ¶¶ 23–28 and at 12; however, there is no pending motion for class certification. Moreover, neither party has briefed the propriety of such class certification.

As the court in *Marx* explained, the Supreme Court's decision in *Eisen*

stand[s] for the proposition that when a district court is determining whether a class action may properly be maintained under [Rule 23], the relative merits of the underlying dispute are to have no impact upon the determination of the propriety of the class action. [*Eisen*] ... do[es] not establish a broad rule that in all cases the determination of the propriety of a class action must precede any consideration of the merits.

747 F.2d at 1552.

Under the circumstances of the instant action, where class certification was neither raised by the parties in a prior motion nor briefed in the instant motion for preliminary injunction or in the cross-motion for dismissal, it is appropriate to determine the merit of the cross-motion for dismissal without determining the class certification demand. In light of the propriety of the cross-motion by the Chief Justice and the Associate Justices for dismissal pursuant to Rule 12(b)(6) and the dismissal of all counts of the Kirchgessner Complaint and the PANJ Complaint, it appears unnecessary to address the class certification issue. *See Marx,* 747 F.2d at 1552 ("To require notice to be sent to all potential plaintiffs in a class action when the underlying claim is without merit is to promote inefficiency for its own sake."). Accordingly, the Kirchgessner Plaintiffs demand for class certification is denied as moot.

*Conclusion*

For the reasons set forth above, the cross-motion by the Chief Justice and the Associate Justices to dismiss the Federal Claims, alleged in counts one through four of the Kirchgessner Complaint and counts one and two of the PANJ Complaint is granted; supplemental jurisdiction will not be exercised as to the State Law Claims, alleged in counts five and six of the Kirchgessner Complaint and in counts three and four of the PANJ Complaint. The motion by Plaintiffs for a preliminary injunction is denied as moot; the

Kirchgessner Plaintiffs demand for class certification is denied as moot.